IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | § |
| Plaintiff-Respondent, | § |
| V. | § CRIMINAL ACTION NO. H-10-788-2 |
| | § CIVIL ACTION NO. H-13-3624 |
| MICHAEL JAMES WASHINGTON, | § |
| Defendant-Movant | § |

**MEMORANDUM AND RECOMMENDATION**

Before the Magistrate Judge in this federal habeas corpus proceeding pursuant to 28 U.S.C. § 2255 is Movant Michael James Washington's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No.238),[1] and the United States's Answer and Motion to Dismiss Movant's § 2255 Motion (Document No. 269). After reviewing the parties' submissions, the record of the proceedings before the District Court in the underlying criminal case, and the applicable case law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that the Government's Motion to Dismiss (Document No. 269) be GRANTED, and that Movant Michael James Washington's § 2255 Motion (Document No. 238) be DENIED.

**I.    Procedural History**

Movant Michael James Washington ("Washington"), who is currently in the custody of the United States Bureau of Prisons, is seeking federal habeas corpus relief under 28 U.S.C.§ 2255. This is Washington's s first attempt at § 2255 relief.

---

[1] Michael James Washington's Motion to Vacate, Set Aside or Correct Sentence can be found at Document No. 1 in Civil Action H-13-3624 and at Document No.238 in Criminal Action No. H-10-788.

On November 10, 2010, Washington along with Michael Anthony Wilbourn, Ronald Dwayne Thomas, and Kenneth Ray Randle were charged by Indictment with aiding and abetting armed bank robbery in violation of 18 U.S.C. §§ 2113(a) & (d), 2 (Count 1), and aiding and abetting the brandishing of a firearm during a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2 (Count 2) (Document No. 27). On April 8, 2011, Washington pleaded guilty to the Indictment without a written plea agreement. (Document No. 76, Transcript of Rearraignment, Document No. 161). The transcript of Washington's Rearraignment confirms that he understood the charges against him, the rights he would give up if he pleaded guilty, the possible penalties, and the sentencing process. (Document No. 161, p. 5-13). The record further reflects that the Government summarized what it was prepared to prove if the case proceeded to trial. In response, Washington confirmed the accuracy of the summary and his role in the offense. The Prosecutor stated:

> If the case would go to trial, the government would be prepared to prove the following: First, the young man to my left, in the green pants, green shirt, is the same Michael Washington as is named in the indictment; and that, more specifically, on Thursday, October 14th of 2010, about 9:45 a.m., the First National Bank located on South Gessner Drive here in Houston, in the Southern District of Texas, was robbed by four young Black men.
>
> I can tell the Court that the First National Bank is federally insured by the FDIC and therefore is covered by the statute. Those four men were later identified as Michael Wilbourn, Michael Washington, Ronald Thomas, and Kenneth Randle.
>
> As the Court knows, Mr. Wilbourn, Mr. Thomas, and Mr. Randle have already pled guilty to the bank robbery and gun count last week.
>
> That morning, a car arrived in front of the bank; and Mr. Wilbourn, Mr. Washington, and Mr. Thomas entered the bank. Mr. Randle had been driving the car that drove up to the bank. Each of the three individuals that entered the bank – Mr. Wilbourn, Mr. Washington, and Mr. Thomas– took control of three female bank employees. Mr. Wilbourn, Mr. Washington, and Mr. Thomas were all armed, each with a pistol.
>
> Mr. Thomas took one bank employee at the point of a pistol and ordered her to get to the ground. Mr. Wilbourn took another bank employee, who was seated at her desk, pointed a pistol at her and again instructed her to get to the ground. Mr.

Washington pointed a pistol at a bank employee, Ms. Watkins, who was working behind the teller counter, and instructed her to open the door which leads from the lobby area to the vault area as well as the area behind the teller counters.

The three men, including Mr. Washington, ordered the employees to the vault room, where they demanded money.  The three men, including Mr. Washington, each threatened to shoot the employees that they were in control of if they didn't hurry up and show them where the money was.  Mr. Thomas and Mr. Wilbourn assaulted a couple of the employees.

One of the employees, Ms. Solis, fearing for her life, informed the three defendants – Mr. Wilbourn, Mr. Washington, and Mr. Thomas– that she had money in her teller drawer.  She gave her teller drawer key to another employee, Ms. Watkins; and they [ ] retrieved the money from her drawer.

Mr. Washington approached another employee— Ms. Solis again– with a pistol pointed at her, demanded to know where the rest of the money was.

Ms. Watkins, fearing for her life, opened the vault, at which time Mr. Washington removed the money from the vault while Mr. Wilbourn and Mr. Thomas maintained control of the bank employees.

Now that they had the money, they left the bank.  But before they left the bank, Mr. Wilbourn, Mr. Washington, and Mr. Thomas threatened to shoot the bank employees if they moved.

The car, as it turned out, was Mr. Wilbourn's car.  They left in a mid Nineties Cadillac.

Some of the money that they had received from the bank had tracking devices in the money, which broadcast a GPS location of where the money was.  The Houston Police Department broadcast that a bank robbery had occurred and, then, generally where the money was being located according to the GPS tracking device.  An HPD officer in that general area saw what he considered to be a suspicious vehicle, a 1995 Cadillac with four young Black men in it.  He simply turned around to follow the car.  And when he pulled behind the car, that car sped off.

He followed the car in a chase to some apartments located on United Street in Houston.  Upon pulling into the apartment complex, the four men in the car — Mr. Randle, Wilbourn, Washington, and Thomas— all jumped out and ran away.  The officer pursued the subjects.  He lost sight of them but was informed by a witness that one of the gentlemen had jumped over a fence and was in a field.  The officer entered the field and found Mr. Randle hiding there.  He took Mr. Randle into custody.

The other officers at the scene, surrounding the apartment complex, were notified by

a maintenance man that there was a window broken out of an apartment just recently. The officers arrived at the apartment, entered the apartment, which was a two-story apartment. Upon entering the apartment, the legal occupants of the apartment ran down the stairs from the second floor into the custody of the HPD officers. They informed the officers that there were two subjects upstairs in their residence that [they] had been holding them hostage for a short while and had broken into their residence.

Mr. Wilbourn and Mr. Washington began to walk down the stairs, where they were met by the HPD officers. They turned around and ran back upstairs trying to evade the HPD officers. The officers went upstairs, took them into custody in the apartment where they had broken into.

The occupants of apartment advised the officers that Mr. Wilbourn and Mr. Washington had broken into their apartment, made them remain in an upstairs bedroom while they — Mr. Wilbourn and Mr. Washington – hid from law enforcement.

Mr. Thomas was later found hiding in a storage closet somewhere in the apartment complex, with some of the money on him.

Mr. Wilbourn, Mr. Washington, and Mr. Thomas were all transported back to the bank that afternoon, where they were viewed separately by the three bank employees that they had held guns on and got the money from; and they were all individually identified by the bank employees as the bank robbers who had taken them hostage and robbed the bank.

The — each of the three men were interviewed– or, actually, all the four men were interviewed, given their Miranda rights. They waived their Miranda rights and agreed to give a statement. All of them confessed to being involved in the bank robbery. And Mr. Wilbourn, Mr. Washington, and Mr. Thomas all confessed to having had guns during the robbery.

The loss to the bank was about $40,312, of which about $35,577 was recovered, about – of which about 19,750 was found at the apartment complex and over $11,000 was found still inside the Cadillac. I think Mr. Thomas was found with about $1,093 or so on him. Actually, the balance of the money has never been recovered. We don't know where it went from that two or three hour period.

The money with the tracking device was recovered inside the Cadillac with two of the pistols used during the bank robbery, some of the clothing worn by the bank robbers and, as I stated, some of the money taken during the bank robbery. Also recovered was a third pistol found near where Mr. Thomas had been hiding.

That would be the facts the government would be prepared to prove if the case went

to trial, your Honor.

The Court:  Mr. Washington, can you tell me in your own words what it is you did to commit the crime that you're pleading guilty to?

The Defendant:  Robbed a bank, with a gun.

The Court:  Okay.  Sort of what Mr. --- essentially what Mr. Schultz said he thought he could prove?

The Defendant:  Yes, ma'am.  (Document No. 161, p. 13-18).

Prior to sentencing, a Pre-Sentence Investigation Report ("PSR") was prepared.  (Document No. 103 & 105).  Washington filed written objections to the PSR.[2]  (Document No. 92).  The PSR assigned Washington a base offense level of 20 under U.S.S.G. § 2B3.1(a).  Because the property of First National Bank, a financial institution was taken, pursuant to U.S.S.G. §2B3.1(b)(1), his offense level was increased two levels.  Because a victim sustained bodily injury, pursuant to U.S.S.G. § 2B3.1(b)(3)(A), his offense level was increased two levels.  Because bank employees were abducted, by being physically restrained and being forced, at gunpoint, to move from the lobby area to the vault area, pursuant to U.S.S.G. § 2B3.1(b)(4)(B), his offense level was increased by four levels. Washington was held accountable for a loss amount of $40,213.50, pursuant to U.S.S.G. § 2B3.1(b)(7)(B).  Based on this loss amount, his offense level was increased one level. Because Washington accepted responsibility for his activities, and did so timely, his base offense level was reduced by three levels.  With an adjusted offense level of 26, and with a criminal history category of VI, Washington had an advisory guideline sentencing range of 120 to 150 months. Count 2

---

[2] Washington objected to ¶ 25, 26, 88 and 89.  In particular, Washington objected to a four level enhancement under U.S.S.G. § 2B3.1(b)(4) based on abducting the bank employees. Washington argued that the bank employees had only been physically restrained not abducted since they remained in the bank and were not taken to another location.  Next, he objected to enhancement related to the intended loss.  Washington argued that the actual loss was $4,375.00, the amount of money taken from the bank that was not recovered.  Lastly, Washington argued against an upward departure under U.S.S.G. § 5K2.0.  (Document No. 92).

required a consecutive sentence of at least 84 months.

At Washington's July 29, 2011[3], sentencing hearing, Judge Harmon questioned Washington about whether he had read over the PSR and discussed the PSR with counsel. Washington confirmed that he had and stated that he had no objections other than those raised by counsel. (Document No. 164, p. 5-7). Judge Harmon overruled Washington's objections of the PSR. Washington was sentenced to a term of imprisonment of 150 months on Count One, to be followed by a consecutive sentence of 84 months as to Count Two, for a total term of imprisonment of 234 months, to be followed by a four-year term of supervised release, and $4,735.00 in restitution. (Document No.115, Transcript of Sentencing Hearing, Document No. 171, p.107-111). In imposing a 234-month sentence, Judge Harmon stated:

> Appearing this afternoon in the court is Mr. Michael J. Washington, who has pled guilty to Aiding and Abetting the Brandishing of a Firearm during a Crime of Violence. Mr. Washington planned with his co-defendants to execute the robbery of the First National Bank, a financial institution in Houston, Texas. He and his two co-defendants were armed with firearms during the commission of the robbery in which they stole approximately $40,213.50 from the bank.
>
> During the robbery, a bank employee was struck in the face by one of the co-defendants, causing bodily injury. Mr. Washington abducted bank employees by physically restraining and forcing them at gunpoint into the vault area of the bank.
>
> He has been convicted of numerous offenses dating back to 2000, which include unauthorized use of a motor vehicle, burglary of a motor vehicle, possession of a controlled substance, evading arrest, and criminal trespassing. He has two outstanding warrants in Harris County for attempted burglary of a motor vehicle and forgery of a Government financial instrument.
>
> The Government and Probation identified factors which might suggest a sentence outside the advisory Guideline range. But I believe that a sentence at the high end of the Guideline range would be a sentence that is sufficient, but not greater than necessary to serve as a deterrent, provide just punishment, and promote respect for the law, as outlined in 18 United States Code section 3553(a). (Document No. 171,

---

[3] Washington's July 7, 2014, sentencing was continued to July 29, 2011. (Document No. 105, Transcript of Sentencing Hearing, Document No. 164).

p. 107-108).

Judgment was entered on August 8, 2011. (Document No. 133). Washington appealed his sentence to the Fifth Circuit Court of Appeals. (Document No. 116). On December 10, 2012, the Fifth Circuit affirmed the Court's application of the bodily-injury and abduction enhancements. (Document No. 221. Washington did not file a petition for certiorari. On or about December 6, Washington timely filed the instant § 2255 motion (Document No. 238), challenging his 84 month sentence imposed on Count Two. Washington bases his § 2255 motion on the Supreme Court's decision in *Alleyne v. United States,* 133 S.Ct. 2151 (2013). Washington claims that he was misadvised by his trial counsel and by the Court about the sentencing consequences of pleading guilty to possessing a firearm during a crime of violence in violation of 18 U.S.C. § 924(c). According to Washington, he believed his plea was to possession for a firearm, which carried a five year mandatory minimum sentence. He further argues that he was denied his constitutional right to effective assistance of counsel because neither his trial counsel nor appeals counsel objected to the § 924(c) violation. The Government has answered and has moved to dismiss Washington's § 2255 motion.

**II. Discussion**

Section 924(c)(1) enumerates the mandatory minimum sentences for any person who uses or carries a firearm during or in relation to a crime of violence, or who possesses a firearm in furtherance is a crime of violence. The statute provides a five-year mandatory minimum sentence for any person who uses, carries, or possesses a firearm, 18 U.S.C. § 924(c)(1)(A)(i), but imposes a seven-year mandatory minimum sentence for anyone who brandishes a firearm during the commission of the crime. *Id.* § 924(c)(1)(A)(ii).

Washington argues that he should have been sentenced to a five- year term of imprisonment

for Count Two, consecutive to his term of imprisonment imposed for Count One, rather than a seven-year consecutive term of imprisonment. Washington contends that he never admitted to brandishing a firearm and bases his claim on the Supreme Court's decision in *Alleyne*. The defendant in *Alleyne* v. *United States*, 133 S.Ct. 2151 (2013), was convicted by a jury verdict of using or carrying a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c). The jury did not find that the firearm Alleyne used was brandished. Alleyne argued that the imposition of the seven-year mandatory minimum sentence based on the sentencing judge's finding of brandishing violated his Sixth Amendment right to a jury trial under *Apprendi v. United States*, 530 U.S. 466 (2000). The sentencing judge rejected Alleyne's argument and sentenced him to seven years. The Supreme Court found Alleyne's argument persuasive and reversed the enhancement, holding that the sentencing enhancement of brandishing should have been charged in the indictment as an element, and been found beyond a reasonable doubt by the jury. *Alleyne*, 133 S.Ct. at 2155. The Supreme Court, however, has not held that *Alleyne* applies retroactively on collateral review and the Fifth Circuit has held that *Alleyne* does not apply retroactively to challenges to sentences on collateral review. *See In Re Kemper*, 735 F.3d 211, 212 (5th Cir. 2013); *United States v. Olvera*, ___F.3d. ___, 2015 WL 110149, at 2 (5th Cir. Jan. 7, 2015)(("We reiterate that *Alleyne* does not apply retroactively. This decision accords with that of every circuit to have examined the issue, none of which has decided that *Alleyne* is retroactive). Moreover, even assuming that it did, *Alleyne* does not benefit Washington.

Washington voluntarily entered his guilty plea and waived his right to have any portion of his case tried by a jury. His claim is further undermined by the Indictment, which charged the sentencing element of brandishing a firearm. Count Two states in pertinent part:

> On or about October 14, 2010, in the Houston Division of the Southern District of

>Texas, Michael A. Wilbourn, Michael J. Washington, and Ronald D. Thomas, defendants herein, each aided and abetted by the other and by others known and unknown to the Grand Jury, each knowingly used, *brandished*, and carried a firearm during and in relation to a felony crime of violence, being an armed bank robbery in violation of 18 United States Code, Sections 2113(a) and (d), for which crime they may be prosecuted in the Federal District Court of the United States. In violation of Title 18, United States Code, Sections 924(c) and 2.

(Document No. 27)(emphasis added). Additionally, at Washington's April 8, 2011, Rearraignment, the Court explained the maximum penalties as follows:

>The Court: I want to go over with you now the maximum [possible] penalties you're facing as a result of your plea of guilty this morning. You are pleading guilty to Count 1, which charges you with bank robbery, a violation of 18, United States Code, Section 2113(a); and Count 2, which charges you with use of a gun in a crime of violence, a violation of 18, United States Code, Section 924(c).
>
>The maximum penalty for Count 1, bank robbery, is up to 20 years in prison without the possibility of parole, plus up to a $250,000 fine, plus up to a three year post-imprisonment supervised release, plus a $100 special assessment, plus restitution if applicable.
>
>Now, along with that supervised release, there would be certain conditions of supervised release that you would be obliged to follow. If you failed to follow those, you could be put back into prison for some additional period of time, without any credit for the time you'd been in prison and without any credit for the time you'd been on supervised release.
>
>And, then, *Count 2 is — which is the use of gun during a crime of violence charge, the penalty for that is a mandatory consecutive sentence of seven years in prison*, plus a fine of up to $250,000, plus up to three years' post-imprisonment supervised release, plus a $100 special assessment. And, again, there would be conditions of that supervised release you'd have to follow.
>
>Do you understand that for both of these charges, that taken all together the prison time, the fine, the supervised release, the conditions of supervised release, and the special assessment, those are the maximum possible penalties you're facing as a result of your plea of guilty this morning?
>
>The Defendant: Yes, ma'am. (Document No. 161, p. 6-7)(emphasis added).

In addition, Washington admitted to the accuracy of the Government's recitation of the facts it was prepared to prove if the matter proceeded to trial. (Document No. 161, p. 13-18). Elements that

increase the mandatory minimum are established in accordance with *Alleyne* when the defendant admits those facts in connection with the guilty plea. *See United States v. Yancy*, 725 F.3d 596 (6th Cir. 2013)(the district court did not violate the defendant's Sixth Amendment rights when it sentenced him for brandishing pursuant to § 924(c)(1)(A)(ii) because the defendant had admitted to brandishing a firearm as part of his guilty plea); *United States v. Harris*, __Fed. Appx.__, 2013 WL 5755249 (7th Cir. Oct. 24, 2013)(*Alleyne* does not apply where a defendant has pled guilty and admitted facts upon which the mandatory minimum penalty is based); *United States v. Oliver*, 544 Fed. Appx. 858, 2013 WL 6037182 (11th Cir. Nov. 15, 2013)(same).

As for Washington's claim that his plea was not knowing and voluntary because he had been misadvised by the Court about the sentencing consequences of brandishing a firearm during a crime of violence, the record contradicts his claim.  The law is clear that a guilty plea must be knowingly, voluntarily, and intelligently made to be constitutionally valid. *United States v. Hernandez*, 234 F.3d 252, 254 (5th Cir. 2000).  Factors the Court considers in evaluating the voluntariness of a guilty plea include whether the defendant: (1) had notice of the charges against him; (2) understood the constitutional protections he was waiving; and (3) had access to competent counsel. *United States v. Washington*, 480 F.3d 309, 315 (5th Cir. 2007).  Declarations made under oath in open court carry a strong presumption of truth. *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977).  Here, the record shows that Washington's guilty plea was knowingly and voluntary.  The transcript of his Rearraignment establishes that Washington confirmed under oath that no one had coerced or threatened him in any way to plead guilty, that no promises had been made to induce him to plead guilty, and that he was pleading guilty because he was guilty and was doing so freely and voluntarily. In addition, he stated that he understood that only the Court could determine his sentence after the PSR had been prepared, and that he would be bound by his plea even if the sentence he received was

higher than expected. As for the factual basis of the plea, he agreed with the Government's factual summary.

As for Washington's claim that his attorney should have objected to the imposition of the seven year sentence on Count two, his claim fails. Claims of ineffective assistance of counsel are generally measured by the standard of *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner must be able to show that his counsel was deficient and that the deficiency prejudiced him to the extent that a fair trial could not be had. *Strickland*, 466 U.S. at 687. Deficiency is judged by an objective reasonableness standard, with great deference given to counsel and a presumption that the disputed conduct is reasonable. *Id*. at 687-88. The prejudice element requires a petitioner to prove that absent the disputed conduct of counsel, the outcome would have been both different and more favorable. *Id*. at 694-95. Under *Strickland*, a petitioner must establish both deficiency and prejudice prongs to be entitled to habeas relief. The failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong. *United States v. Seyfert,* 67 F.3d 544, 547 (5th Cir. 1995).

Under the deficiency prong of *Strickland*, judicial scrutiny of counsel's performance is "highly deferential" and "a strong presumption" is made that "trial counsel rendered adequate assistance and that the challenged conduct was the product of reasoned trial strategy." *Wilkerson v. Collins*, 950 F.2d 1054, 1064-65 (5th Cir. 1992), *cert. denied,* 509 U.S. 921 (1993) (citing *Strickland*). To overcome the presumption of competence, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Under the prejudice prong of *Strickland,* a petitioner must be able to establish that absent his counsel's deficient performance, the result of his trial could have been different. "An error by counsel, even if professionally unreasonable, does not warrant setting

aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. When ineffectiveness claims relate to counsel's performance at sentencing, *Strickland's* deficiency prong is met when counsel fails to "research facts and law and raise meritorious arguments based on controlling precedent. *United States v. Fields*, 565 F.3d 290, 296 (5th Cir.), *cert. denied*, 558 U.S. 914 (2009)(citing *United States v. Conley*, 349 F.3d 837, 841 (5th Cir. 2003)).  In addition, "'any amount of [additional] jail time has Sixth Amendment significance.'" *Lafler v. Cooper*, ___U.S.___, 132 S.Ct. 1376, 1386 (2012)(quoting *United States v. Glover*, 531 U.S. 198, 203 (2001)).  Counsel is not required to "anticipate changes in law or raise meritless objections." *Fields*, 565 F.3d at 296.

Constitutionally effective assistance of counsel under *Strickland* is not errorless counsel. The determination of whether counsel has rendered reasonably effective assistance turns on the totality of facts in the entire record. Each case is judged in light of the number, nature, and seriousness of the charges against a defendant, the strength of the case against him, and the strength and complexity of his possible defense. *Baldwin v. Maggio*, 704 F.2d 1325, 1329 (5th Cir. 1983), *cert. denied,* 467 U.S. 1220 (1984). The reasonableness of the challenged conduct is determined by viewing the circumstances at the time of that conduct. *Strickland,* 466 U.S. at 690. "We will not find inadequate representation merely because, with the benefit of hindsight, we disagree with counsel's strategic choices." *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999) (quoting *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997)). Conclusory allegations of ineffective assistance of counsel do not raise a constitutional question in a federal habeas petition. *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir), *cert. denied*, 531 U.S. 849 (2000) (citing *Barnard v. Collins,* 958 F.2d 634, 642 (5th Cir. 1992); *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

The United States Supreme Court in *Harrington v. Richter*, ___U.S.___, 131 S.Ct. 770, 778 (2011) discussed *Strickland* in the context of a habeas proceeding involving a state conviction.

While *Harrington* did not involve a federal habeas proceeding involving a federal conviction, the Court's discussion of *Strickland* and ineffective assistance of counsel claims is instructive and equally applies to claims brought in a federal habeas proceeding such as those raised herein.

With respect to ineffective assistance of counsel claims, the Court observed that "[t]here are, [ ] 'countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.' Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Id.* at 788-89 (quoting from *Strickland*, 466 U.S. at 689). As a result, counsel's performance does not fall below that guaranteed by the Sixth Amendment where it can be shown that counsel formulated a strategy that was reasonable at the time and balanced limited resources with effective trial tactics and strategies. *Harrington*, 131 S.Ct. at 789. "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Harrington*, 131 S.Ct. at 791. Moreover, "it is difficult to establish ineffective assistance when counsel's *overall* performance indicates active and capable advocacy." *Harrington*, 131 S.Ct. at 791 (emphasis added). Finally, in considering the prejudice prong of *Strickland*, the likelihood of a different result must be substantial, not just conceivable. *Id.* at 791-792 (Citations omitted). As a result, "'[s]urmounting *Strickland's* high bar is never an easy task.'" (quoting from *Padilla v. Kentucky*, 559 U.S. 356, 371(2010)). In part, because:

> Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.

*Harrington*, 131 S.Ct. at 778 (citations omitted).

Here, the facts do not support Washington's contention that trial counsel or appeals counsel rendered ineffective assistance of counsel. As discussed above, Washington's challenge to his § 924(c) sentence of 84 months is legally without merit. Thus neither trial nor appellate counsel's performance fell below that of *Strickland*. Counsel has no duty to raise meritless claims. *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994). *See United States v. Wilkes*, 20 F.3d 651, 653 (5th Cir. 1994)(quoting *Smith v. Puckett*, 907 F.2d 581, 585 n. 6 (5th Cir. 1990)("Counsel is not deficient for, and prejudice does not issue from, failure to raise [on direct appeal] a legally meritless claim.").

As for Washington's argument that the Indictment was defective, the Indictment charged the sentencing elements of brandishing a firearm. Additionally, relief under §2255 is available for a challenge to the sufficiency of the Indictment where the indictment is deficient to the extent that it deprives the Court of jurisdiction. *See United States v. Armstrong*, 951 F.2d 626, 628-29 (5th Cir. 1992). Here, Washington's alleged deficiency is not jurisdictional and does not provide a basis for § 2255 relief. *See Wesson v. U.S. Penitentiary Beaumont*, 305 F.3d 343, 346 (5th Cir. 2002).

### III. Conclusion and Recommendation

Based on the foregoing, it is

RECOMMENDED that the Government's Motion to Dismiss Movant's § 2255 Motion (Document No. 269) be GRANTED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record. Within 14 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed.R.Civ.P. 72(b), and General Order 80-5, S.D. Texas. Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir.

1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc). Moreover, absent plain error, failure to file objections within the fourteen day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996). The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208.

Signed at Houston, Texas, this 30th day of January, 2015.

_____
Frances H. Stacy
United States Magistrate Judge